**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOHN DOE, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| TORRINGTON BOARD OF EDUCATION, | : | No. 3:15-cv-00452 (MPS) |
| CHERYL KLOCZKO, JOANNE CREEDON, | : | |
| CHARLES McSPIRIT, MICHAEL McKENNA, | : | |
| DANIEL DUNAJ, JOHANNAH DEZURIK, | : | |
| GERALD CARBONE and JAMES DZIEKAN | : | |
| | : | |
| Defendants. | : | |

**RULING ON MOTION TO DISMISS**

Plaintiff John Doe filed a fourteen-count amended complaint against the Torrington Board of Education and several of its employees alleging violations of the following federal laws: the Due Process Clause of the Fourteenth Amendment under 42 U.S.C. § 1983 (Counts One and Two); the Equal Protection Clause of the Fourteenth Amendment under § 1983 (Counts Three and Four); Section 504 of the Rehabilitation Act, 29 U.S.C. §794 ("Section 504") (Count Five); Title II of the Americans with Disabilities Act, 42 U.S.C. §12132 ("ADA") (Count Six); and Title IX of the Higher Education Act of 1972, 20 U.S.C. § 1681 ("Title IX") (Count Seven). Defendants move to dismiss Doe's First Amended Complaint ("FAC"). (ECF Nos. 23 and 28.) The Court GRANTS Defendants' motions to dismiss. The federal claims—Counts One through Seven—are dismissed with prejudice because they fail to allege facts that make it plausible that the Defendants violated the federal laws listed above. The state law claims—Counts Eight through Fourteen—are dismissed without prejudice to refiling them in state court.

**I.     BACKGROUND**

The following factual allegations are taken from the FAC and are accepted as true for the purpose of deciding Defendants' motions to dismiss.

### A.   Factual Background

Doe is a resident of Connecticut. (FAC, ECF No. 22 ¶ 1.) He was diagnosed with a learning disability that qualified him for services and accommodations under the Individuals with Disabilities Education Act ("IDEA") and Section 504.[1] (*Id.* ¶ 16.) Doe attended Torrington High School ("THS") from August 2011 until April 5, 2013. (*Id.* ¶ 15.) From April 23, 2013, until July 2013, instead of attending THS, Doe received three hours of tutoring per day at the office of defendant Torrington Board of Education (the "Board"). (*Id.*)

Defendant Cheryl Kloczko was Superintendent of the Board during the relevant time period. (*Id.* ¶ 3.) Doe alleges that, "[a]s Superintendent, Kloczko was the individual primarily responsible for . . . formulating and implementing policies and ensuring that the Board followed the law, including, but not limited to, equal access to education and equal treatment for all students, and was the ultimate authority and decision-maker of the Board." (*Id.*) Defendant Joanne Creedon was the Principal of THS during the relevant time period. (*Id.* ¶ 4.) As Principal, Creedon was responsible for "the welfare of the students" and "the implementation of policies and procedures governing the schools." (*Id.*) Doe alleges that Creedon failed to "ensure that staff were properly trained regarding

---

[1] Since the filing of the motions to dismiss, the parties have "agreed that questions relating to whether plaintiff was provided with an appropriate educational program are within the jurisdiction of the State hearing officer [of the State Department of Education]." (ECF No. 39 at 3; ECF No. 41 at 2.) Doe "agreed to amend the complaint . . . to delete references to the IDEA" and the allegations that Doe was denied a free appropriate public education ("FAPE"). (ECF No. 39 at 3; ECF No. 41 at 2; telephonic status conference of February 10, 2016). Because Doe has not amended the complaint in this fashion, and the date for amending the complaint has passed, the Court dismisses Doe's claims related to violations of the IDEA and the denial of a FAPE, and does not address the Defendants' motion to dismiss those claims under Rule 12(b)(1) of the Federal Rules of Civil Procedure. For the purposes of the factual background, the Court omits facts related to Doe's IDEA claims that are unrelated to his other federal claims.

their obligations to report[] and address bullying." (*Id.*) Defendant Charles McSpiritt was Vice

Principal of THS during the relevant time period, and was responsible for overseeing students'

welfare, investigating students' misbehavior, and "disciplin[ing] students." (*Id*. ¶ 5.) Michael

McKenna, as the Athletic Director at THS during the relevant time period, was responsible for THS

sports programs, including drafting and implementing polices on discipline and safety of student-

athletes. (*Id*. ¶ 6.) Defendant Dan Dunaj was the Head Football Coach at THS during the relevant

time period, and was responsible for "ensur[ing] the safety and well-being of each of his players."

(*Id*. ¶ 7.) Defendant Johanna DeZurik, as a guidance counselor at THS, was responsible for

"providing assistance, planning, and support for students . . . ." (*Id*. ¶ 8.) Defendant Gerard Carbone

was a special education teacher for Doe. (*Id*. ¶ 9.) Carbone was also Doe's special education case

manager and, as such, was responsible for checking on Doe's educational and social progress as

well as scheduling Planning and Placement Team ("PPT") Meetings and performing other

administrative tasks. (*Id*.) Finally, Defendant James Dziekan was "a school social worker assigned

to counsel . . . Doe." (*Id*. ¶ 10.) Doe alleges that Creedon, McSpiritt, McKenna, Dunaj, DeZurik,

Carbone, and Dziekan personally participated in and/or directed actions that they knew or should

have known violated Doe's rights under the U.S. Constitution, federal law and state law. (*Id*. at ¶¶

4-10.)

### 1.  Doe's Freshman Year (Fall 2011-Spring 2012)

In October of 2011, approximately two months after Doe joined the THS football team in

August "Student A"[2] threw Doe down to the floor of the locker room, causing his glasses to break.

Student A then took Doe's hat and rubbed it on Student A's genitals. (*Id*. ¶¶ 18-19.) Doe reported

the incident to school officials, and Student A was suspended for what Doe alleges was fewer than

10 days. (*Id*. ¶ 20.) Doe "was assured that his disclosure to school officials would remain private,

---

[2] The parties did not use the minor students' names to protect their privacy.

however, students and staff on the football team learned" that Doe had reported the incident to school officials "and began to retaliate against him." (*Id.*) McSpiritt provided Principal Creedon with a written report about the incident, and thereafter, continued to inform Principal Creedon of Doe's allegations of bullying and harassment. (*Id.* ¶ 21.) Doe alleges, upon information and belief, that "Principal Creedon personally approved McSpiritt's actions and inactions." (*Id.* ¶ 22.)

In late October or early November of 2011, Student B, a player on the football team, tackled Doe and "said he wanted to fight" Doe. (*Id.* ¶ 23.) Doe alleges that "[b]ecause prior reports were not handled properly by staff and coaches, and because coaching staff perpetrated, condoned, and acquiesced to retaliation between team members, the Plaintiff did not feel safe to report the incident to anyone immediately after it occurred." (*Id.*) Doe's mother reported the assault to administrators at some later date. (*Id.*)

In January of 2012, Doe suffered an injury that limited his ability to play football. (*Id.* ¶ 25.) Doe alleges that "[h]e was ridiculed both by coaches and students, and called a 'pussy,' 'bitch,' and 'baby'" and "[t]he football coaches, led by Dunaj, participated in, encouraged, and condoned this harassment." (*Id.*) The amended complaint does not allege that Doe reported this harassment to school officials.

In the spring of 2012, Doe was at track practice when Student C, who, like Doe, was a member of both the track and football teams, threw Doe to the ground and threw rocks in his face, which caused Doe to swallow a rock. (*Id.* ¶ 26.) Doe did not feel safe reporting the incident to school officials; Doe's mother reported it to administrators at some later date. (*Id.*) Doe alleges that "[f]rom that point until the end of his freshman year, [he] was assaulted by Student B and/or C, or other students nearly every day." (*Id.* ¶ 27.)

Also in the spring of 2012, Student D, a football player, hit Doe on the back of the neck with a "karate chop." (*Id.* ¶ 30.) Doe "then defended himself by executing the same on Student D." (*Id.*)

Both Doe and Student D received In-School Suspension ("ISS") as punishment. (*Id.*) Dunaj told the football team that Doe received ISS and "disciplined the entire team for the Plaintiff's ISS by forcing all players to run 'gassers,' or a series of sprinting exercises." (*Id.* ¶ 31.) Doe alleges Dunaj and the other football coaches were aware that "requiring the entire team to run gassers as a result of one student's discipline would encourage players to retaliate within the team." (*Id.* ¶ 32.) After practice, other football players, including Students B and E, sought out Doe and "retaliated against him by repeatedly striking him on the neck." (*Id.* ¶ 33.) The amended complaint does not allege that Doe reported these assaults to school officials.

### 2.  August 2012 Incident

In August of 2012, Doe and several others were playing football in a park when Student B committed a sexual assault on Doe in the presence of several other students. (*Id.* ¶ 34.) Again, Doe did not feel safe reporting the incident immediately after it occurred. (*Id.* ¶ 35.)

### 3.  Sophomore Year (Fall 2012-Spring 2013)

Beginning in the fall of 2012, Doe alleges that other students repeatedly harassed him in class, calling him a "faggot" and a "fat ass." (*Id.* ¶ 36.) An unnamed teacher "heard the harassment and failed to discipline the other students." (*Id.*) On September 12, 2012, DeZurik left a voicemail for Doe's mother in which she indicated that she had spoken to Doe and was aware that he was being harassed. DeZurik told Doe's mother that "she would not take direct action because the Plaintiff declined to offer names." (*Id.* ¶46.) Doe "began to stay home from school out of fear for his physical safety and because of severe anxiety related to the bullying that was occurring at school. He was absent numerous days and his grades began to drop." (*Id.* ¶ 47.)

On November 12, 2012, THS convened a PPT meeting—at the request of Doe's mother—to address, among other things, the "severe and ongoing patterns of bullying, sexual harassment, and retaliation by students and the impact of this bullying on" Doe. (*Id.* ¶ 48.) During this meeting,

Doe's mother informed school officials and/or referenced several of the previous incidents involving Doe. (*Id.*) Also during the meeting, Carbone "became visibly agitated with and angry" at Doe for refusing to name the harassers. (*Id.* ¶ 49.) Carbone told Doe, "I am sick of hearing about phantom bullies." Doe then "reluctantly provided names of some of the perpetrators." (*Id.* ¶ 50.)

On January 18, 2013, the school convened another PPT meeting—also at the request of Doe's mother—for the same reasons as the first meeting. (*Id.* ¶ 51.) Doe's mother again talked about several previous incidents of bullying against Doe. (*Id.*) Doe's private counselor attended this PPT meeting "to express her concerns regarding the harassment that was occurring and the lack of response by the school." (*Id.* ¶ 52.) During the meeting, DeZurik, McSpiritt, and Carbone characterized the harassment as "everyday banter between the boys, back and forth." (*Id.* ¶ 53.) Doe's counselor, his mother, and his grandmother objected to this characterization and "voiced their disagreement." (*Id.*) The PPT decided that Doe would receive 30 minutes of counseling per week with Dziekan "to assist him in dealing with issues related to his peers because of his 'sensitivity.'" (*Id.* ¶ 54.) The PPT also planned for Doe to "leave his resource study hall early to avoid being harassed for his status as a student in need of special education services." (*Id.*) Doe's mother stated that she believed this "safety plan" was insufficient, and disagreed that Doe's issues arose from his sensitivity. (*Id.*) Doe signed a release on September 13, 2012, to allow Dziekan to communicate with Doe's private counselor about the harassment. (*Id.* ¶ 55.) Dziekan, however, never contacted the private counselor, despite Doe's mother's request that he do so. (*Id.*)

On March 17, 2013, Doe's mother attended an "attendance appeal meeting" to address Doe's attendance issues. (*Id.* ¶ 58.) During the meeting Doe's mother "pleaded for help to end the bullying, assault and harassment so that the Plaintiff could return to school." (*Id.*) On that same day, Student F, pushed Doe in the chest and said, "What the fuck, gay boy." (*Id.* ¶ 59.) Doe pushed Student F away from him in self-defense. (*Id.*) Teacher Eric Gamari witnessed this incident, but

dismissed it as mutual and did not discipline Student F. (*Id.*) The next day, Doe refused to go to school because of the bullying and harassment. (*Id.* ¶ 60.) Doe's mother informed Carbone that Doe was afraid to go to school. (*Id.*) On March 20, Doe's mother called Dziekan and informed him of the continuing bullying. (*Id.* ¶ 61.) Dziekan informed Doe's mother that he had not met with Doe since the PPT two months earlier, as planned. (*Id.*)

At an unspecified time, after Doe "had missed significant time from his first period class due to his anxiety over bullying, Gamari asked, 'Oh, you decided to get off your recliner and come here.'" (*Id.* ¶ 65.) Also during this time period, Creedon acknowledged to Doe's mother and grandmother that she was aware that student athletes were left unsupervised for periods of time during which these assaults were occurring. (*Id.* ¶ 70.)

On April 1, 2013, Doe was in resource study hall with a paraprofessional, Dorrette Murphy. (*Id.* ¶ 62.) After Murphy opened the window blinds—making the inside of the classroom visible from the hallway—Doe "turned his desk to be shielded from view in order to avoid the ridicule of other students for requiring services for his special education needs." (*Id.*) Seeing this, Murphy asked Doe, "What? Are you embarrassed? You should be embarrassed. About the only thing you should be embarrassed about is yourself. You are a hider." (*Id.* ¶ 63.) Murphy's statements "provoked other students to call Plaintiff a hider. She then suggested that the other students get paint and write the Plaintiff's name on the window." (*Id.*) Doe then asked whether he could leave class early according to the safety plan. (*Id.* ¶ 64.) In response, Murphy asked:

> "Who arranged that? I wish I could leave 5 minutes early." She then stated to the rest of the class, "Don't you wish you could?" When the Plaintiff responded that his Guidance Counselor had given him permission, Murphy stated: "we should all go to our Guidance Counselors so we can leave early."

(*Id.*) That afternoon at track practice, Students B and C cornered Doe, pushed him against a fence, and repeatedly punched him. (*Id.* ¶ 66.) Doe suffered from contusions and his shirt was ripped. (*Id.*) The following day, on April 2, Doe's mother brought the ripped shirt to school and informed

McSpiritt of the incident. (*Id.* ¶ 67.) Doe then "disclosed the perpetrators names." (*Id.*) Later that day, the track coach, Michael Tyler, called Doe's mother and told her that he believed that Doe had been embellishing complaints of harassment. (*Id.* ¶ 68.) Also on April 2, McSpiritt characterized the April 1 incident as mutual horseplay. (*Id.* ¶ 69.)

Throughout the academic year, Doe participated in a program with the State Police Department, and on April 4, Doe was asked how things were going at school. (*Id.* ¶ 71.) Doe told them that he was being harassed at school and had been sexually assaulted during the summer of 2012. The police began investigating. (*Id.*)

On April 5, Tyler informed Doe that he could no longer participate on the track team because of his grades. (*Id.* ¶ 72.) Doe alleges that "[a]nother student, a runner with the ability to run very competitively, was not asked to leave the team, despite similarly poor grades." (*Id.*) Doe alleges that his removal from the track team was retaliation "for asserting his right to be free from harassment, discrimination and physical assault based on his disability and gender." (*Id.* ¶ 73.)

Also on April 5, Doe and a State Trooper told Doe's mother that Student B had sexually assaulted Doe during the summer of 2012. (*Id.* ¶ 74.) Doe's mother immediately removed Doe from school "out of fear for his safety." (*Id.*) During a PPT Meeting on April 8 to discuss the April 1 incident, the State Trooper informed the PPT that Doe had disclosed another incident and they would be filing a police report after the PPT Meeting. (*Id.* ¶ 75.) The PPT was not informed that the other incident involved a sexual assault. (*Id.*) The State Trooper also requested that the PPT establish a safety plan, and McSpiritt said that he would review students' schedules to ensure that they did not cross paths. (*Id.* ¶ 76.) Nevertheless, Doe "crossed paths" with one of the students the next day. (*Id.*) At the same meeting, Doe's mother asked McSpiritt whether Students B and C had been disciplined for their conduct. (*Id.* ¶ 77.) McSpiritt said that Student C had been suspended from the track team, but after further inquiry, McSpiritt acknowledged that Student C was

suspended from the track team because of his low grades, not as discipline for his conduct toward
Doe. (*Id.*)

On April 17, 2013, the Torrington police and Doe's mother informed Superintendent
Kloczko about "the sexual assault by Student B and the history of bullying, physical assault,
discrimination and harassment by Student B and others against" Doe. (*Id.* ¶ 79.) Kloczko offered
that Doe could "be removed from school to receive three hours per day of tutoring" at the Board
offices. (*Id.* ¶ 81.) With no other alternatives, Doe's mother "reluctantly agreed" to the plan; Doe
began tutoring on April 23. (*Id.*) Doe alleges that such tutoring programs are offered to students
who are expelled. (*Id.* ¶ 82.)

During a June 5, 2013, PPT Meeting, school officials "denied any incidents of bullying,
harassment, or retaliation." (*Id.* ¶ 84.) In July 2013, Doe and his mother moved out of Torrington so
that Doe could attend another school. (*Id.* ¶ 81.) On September 26, 2014, after a trial, Student B was
convicted of crimes related to the sexual assault of Doe. (*Id.* ¶ 85.) Student B was sentenced to six
months of prison (time-served) and three years of probation. (*Id.*)

### 4.  Other Violent Conduct by Athletes from 2011-2013

In November of 2011, two members of the THS football team (Students W and X) were
charged and arrested for rape of minor girls. Student X pleaded guilty to risk of injury to a minor
with illicit sexual contact. (*Id.* ¶ 24.) Doe alleges that the Defendants were aware of these arrests,
and both students were expelled from THS for one year. (*Id.*)

In March of 2012, Student Y, the Most Valuable Player of the THS football team during the
2011-2012 year, "was charged with felony robbery related to jumping three fourteen-year-old
boys." (*Id.* ¶ 28.) At least one co-conspirator in the robbery, Student Z, was also a THS football
player. Although Student Z graduated in 2012, Student Y was allowed to play football in the fall of

2012 (his senior year). "Student Y was later arrested for the sexual assault of two 13 year-old females." (*Id*.)

In the fall of 2012, Doe alleges that "the Defendants were informed of other significant and severe acts of hazing, harassment, physical assault and sexual assault among players on the football team," including that "a student was sodomized in the locker room and had items forced into his mouth, causing injuries." (*Id*. ¶ 37.) Around the same time, during the 2012-2013 football season, Defendants became aware of three other incidents of bullying and assault (*id*. ¶ 39): (1) an incident of hazing in which a pencil eraser was placed in a football player's rectum (*id*. ¶ 40); (2) an upper classman—with icy-hot cream on his hands—grabbed a freshman's genitals (*id*. ¶ 41); and (3) a freshman football player was forced to suck the toe of a senior. (*Id*. ¶ 42.) Although some students were disciplined, none were expelled. (*Id*. ¶ 44.)

In late February of 2013, two THS football players were arrested on charges of sexually assaulting two 13-year old girls. Both were expelled from THS for one year, and both pleaded guilty to charges related to their arrests. (*Id*. ¶ 56.) After their arrests, other students, including student athletes, bullied one of the victims on social media. (*Id*. ¶ 57.)

**B. Procedural History**

Doe filed his original complaint on March 27, 2015. (ECF No. 1.) On May 1, 2015, one group of Defendants—the Board, Kloczko, Creedon, McSpiritt, Dezurik, Carbone, and Dziekan ("First Group")—filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 15.) Thereafter, the Court gave Doe an opportunity to file an amended complaint "to address the alleged defects discussed in Defendants' memorandum of law" (Order, ECF No. 16), and he did so on May 29, 2015. (FAC, ECF No. 22.) On June 16, 2015, the First Group of Defendants renewed their motion to dismiss the FAC and incorporated by reference their

prior brief. (ECF No. 23.) Defendants Dunaj and McKenna filed a motion to dismiss the FAC on

June 19, 2015. (ECF No. 28.)

## II.    STANDARD

Under Fed. R. Civ. P. 12(b)(6), the Court must determine whether the Plaintiff has alleged

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570. Under *Twombly*, the Court accepts as true all of the complaint's factual allegations

when evaluating a motion to dismiss. *Id*. at 572. The Court must "draw all reasonable inferences in

favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517

F.3d 104, 115 (2d Cir. 2008). "When a complaint is based solely on wholly conclusory allegations

and provides no factual support for such claims, it is appropriate to grant defendants['] motion to

dismiss." *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004). For a complaint to

survive a motion to dismiss, "[a]fter the court strips away conclusory allegations, there must remain

sufficient well-pleaded factual allegations to nudge plaintiff's claims across the line from

conceivable to plausible." *In re Fosamax Products Liab. Litig.*, 2010 WL 1654156, at *1 (S.D.N.Y.

Apr. 9, 2010).

## III.   DISCUSSION

### A.  Federal Claims

#### 1.  Due Process Clause (Counts One and Two)[3]

---

[3] In his memorandum of law opposing Defendants' motions, Doe asserts that Defendants deprived him of a property interest in a free and appropriate education in violation of his right to procedural due process. (Pl.'s Opp. Br., ECF No. 33 at 25.) This claim does not appear in his amended complaint. "In general, plaintiffs are not permitted to raise new theories of their case in opposition to a motion for summary judgment." *Munoz v. City of New York*, No. 04 CIV. 1105 (JGK), 2008 WL 464236, at *7 (S.D.N.Y. Feb. 20, 2008) (citation omitted). Because the amended complaint omitted a claim for violation of procedural due process, Doe is precluded from raising such a claim in opposition to the motion to dismiss. *See Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 308 (S.D.N.Y. 2010) ("a party cannot amend its pleading through its opposition brief"). Moreover, as stated above, the parties have "agreed that questions relating to whether

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. Doe alleges that the individual Defendants (Count One) and the Board (Count Two) violated his due process rights under the Fourteenth Amendment by, among other things, failing to follow bullying policies and procedures, failing to train staff, failing to maintain order and discipline, allowing students to assault Doe, and failing to ensure Doe's safety and protect him from specific students. (*See* FAC ¶¶ 88-117.) Doe alleges that Defendants' actions and inactions violated "his rights to due process and to be free from sexual abuse as provided by the Fourteenth Amendment of the Constitution and his right to privacy and to be free from violations of bodily integrity as protected by the Fourth, Fifth, Ninth and Fourteenth Amendments." (*Id.* ¶¶ 101-03.)

The Due Process Clause protects the "right to be free from . . . unjustified intrusions on personal security." *Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008) (internal quotation marks and citations omitted); *Spring v. Allegany-Limestone Cent. Sch. Dist.*, No. 14-CV-476S, 2015 WL 5793600, at *5 (W.D.N.Y. Sept. 30, 2015) ("A claim that a plaintiff was deprived of a liberty interest in freedom from unjustified intrusions on personal security as a result of a defendant's failure to protect invokes the substantive rather than procedural component of the Due Process Clause."). "But nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). The Due Process clause does not provide an "affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government

---

plaintiff was provided with an appropriate educational program are within the jurisdiction of the State hearing officer." (ECF No. 39 at 3; ECF No. 41 at 2.)

itself may not deprive the individual." *DeShaney*, 489 U.S. at 196. There are two exceptions to this general principle: the state or its agents may owe a constitutional obligation to the victim when (1) the victim was in a "special relationship" with the state, or (2) the state "in some way had assisted in creating or increasing the danger to the victim." *Matican*, 524 F.3d at 155. Doe alleges that both of these exceptions apply.

### a. Special Relationship

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Matican*, 524 F.3d at 156 (quoting *DeShaney,* 489 U.S. at 199-200). Although the Second Circuit has not yet addressed whether compulsory school attendance creates such a "special relationship," other "courts in this Circuit and others addressing cases of peer-on-peer bullying in schools have held that the special relationship doctrine does not apply in the public school context, even if school attendance is compulsory." *Spring,* 2015 WL 5793600, at *6 (citations omitted); *Reid ex rel. Roz B. v. Freeport Pub. Sch. Dist.*, 89 F. Supp. 3d 450, 458 (E.D.N.Y. 2015) ("The Court agrees with other courts in this circuit and elsewhere in holding that Roz B.'s status as a student did not put her in the custody of the State at the time of the alleged sexual assault, foreclosing any reliance on the 'special relationship' exception to *DeShaney.*"); *Gagnon ex rel. MacFarlane v. E. Haven Bd. of Educ.*, 29 F. Supp. 3d 79, 83-84 (D. Conn. 2014) (noting "wide consensus among federal courts of appeals" that the special relationship exception does not apply to schools and stating that "[i]n this district, our courts likewise have held that the 'special relationship' exception does not apply to schools."); *Chambers v. N. Rockland Cent. Sch. Dist.*, 815 F. Supp. 2d 753, 764 n.10 (S.D.N.Y. 2011) (citing cases showing that "[t]he consensus among the courts is that the 'special relationship' does not apply in the school setting"). These courts reason that "while schools impose certain rules and restrictions on students, they do not limit

13

an individual's freedom to act in the same manner as involuntary confinement by the state in a state prison or mental institution." *P.W. v. Fairport Cent. Sch. Dist.*, 927 F. Supp. 2d 76, 82 (W.D.N.Y. 2013). I agree with these courts and find that there is no special relationship between Doe and the Defendants as a result of compulsory school attendance. And because Doe has not pled any other facts that would warrant a finding of "custody" or a "special relationship" between Doe and the State, I dismiss this theory of liability.

### b. State-Created Danger

In order to show that the "state-created danger" exception applies, Doe "must show more than the State's general knowledge of a danger; he must show that the State assisted in creating or increasing the danger that the victim faced at the hands of a third party." *Spring*, 2015 WL 5793600, at \*6 (internal quotation marks and citations omitted); *see Matican*, 524 F.3d at 157. "Passive conduct, such as the failure to punish, does not fall within this exception; instead, there must be an affirmative act on the part of a defendant." *Spring*, 2015 WL 5793600, at \*6 (*citing Pena v. DePrisco*, 432 F.3d 98, 110 (2d Cir. 2005)). "A failure to interfere when misconduct takes place, and no more, is not sufficient to amount to a state *created* danger." *Pena*, 432 F.3d at 110. When, however, "state officials communicate to a private person that he or she will not be . . . punished[] or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct" even if "none of the defendants are alleged to have communicated the approval explicitly." *Pena,* 432 F.3d at 111. "[I]n the context of school bullying and harassment, courts have held that schools have no duty under the due process clause to protect students from assaults by other students, even where the school knew or should have known of the danger presented." *Scruggs v. Meriden Bd. of Educ.*, No. 3:03-CV-2224 (PCD), 2007 WL 2318851, at \*12 (D. Conn.

14

Aug. 10, 2007) (internal quotation marks and citations omitted) (citing cases by the 3rd, 5th, 6th, 7th, 8th, and 10th Circuits).

Doe argues that his complaint "plausibly establishes that the student assailants knew of the Defendants' violent intentions towards" him, and Defendants' "continuing non-response to previous harassment and violence towards . . . Doe, amount[ed] to a signal that they would tolerate the assailants' escalating behavior." (Pl.'s Opp. Br., ECF No. 33 at 31.) But Doe does not allege that any of the assailants who were not disciplined were aware that Doe had reported their assaults to school officials. *See Chambers*, 815 F. Supp. 2d at 767; *see also Spring*, 2015 WL 5793600, at *6 (alleged "failure to adequately discipline and supervise" is "insufficient to plausibly state a substantive due process claim based on a state-created danger.") Moreover, in several instances, the assailants were disciplined. For example, Student A was suspended for throwing Doe to the floor. (FAC ¶¶ 18-20.) Both Doe and Student D were disciplined for hitting each other in the spring of 2012. (*Id.* ¶ 30.) And in several other instances where the assailants were not disciplined, Doe had failed to report the incidents or refused to name the perpetrators. Doe reported that Students B and C punched him at track practice, and alleges that students B and C were not disciplined, but Doe does not allege that Students B and C were aware that Doe had reported the incidents (or any previous incidents) to school officials. "Defendants' mere failure to take steps to fully remedy the situation does not amount to an affirmative creation of danger." *Scruggs*, 2007 WL 2318851, at *12. Doe makes no non-conclusory factual allegations that Defendants encouraged violence against him or harbored "violent intentions" toward him. Thus, Doe's allegations are insufficient to show state-created danger.

### c.  Egregious and Outrageous

Even if Doe's claims were to fall within one of the exceptions, Doe must also show that Defendants' "behavior was 'so egregious, so outrageous, that it may fairly be said to shock the

contemporary conscience.'" *Matican*, 524 F.3d at 155 (*quoting Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998)). Doe argues that "Defendants completely ignored reports of assault . . . on the basis that such assaults were simply 'boys being boys' and 'everyday banter' and that John Doe was simply 'embellishing' and being 'sensitive.'" (Pl.'s Opp. Br., ECF No. 33 at 32.)

Doe does not sufficiently allege that Defendants' behavior was egregious, outrageous, or conscience-shocking, and his factual allegations do not support his conclusory statement that "Defendants completely ignored reports of assault." Doe did not report every incident, and when he did, Defendants did, in fact, discipline students, including Students A and D. Defendants also took other actions to address the bullying, including meeting to discuss it, offering Doe counseling, allowing Doe to leave a class early to avoid certain students, and providing tutoring at the Board's offices. *See S.C. v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-1672 CS, 2012 WL 2940020, at *8 (S.D.N.Y. July 18, 2012) ("Defendants here at least took some steps to address M.R.'s situation, including the use of a recess monitor and counseling M.R. on his assertiveness and communication skills. That these measures failed to stop the bullying may give rise to a state[]law negligence claim . . . but not to a substantive due process violation."). And although in some cases Doe alleges that he reported bullying or assaults and Defendants did not take disciplinary action, this does not rise to the level of egregious or outrageous conduct. *See Smith v. Guilford Bd. of Educ.*, 226 F. App'x 58, 62 (2d Cir. 2007) (summary order) ("Defendants' failure to respond to the harassing and bullying to which Jeremy was subjected . . . while highly unfortunate, does not rise to the level of 'egregious conduct . . . so brutal and offensive to human dignity as to shock the conscience.'"); *see also Scruggs*, 2007 WL 2318851, at *13 (finding, on motion for summary judgment, that Defendants' limited "response to the repeated bullying of Daniel"—including assaults—and "failure to fully remedy the bullying situation does not amount to 'brutal' or 'oppressive' treatment," as "Defendants did discipline some of the bullying perpetrators, and they did take steps to try to ensure

16

Daniel's well-being, including recommending his transfer to [another] program once they concluded that his safety was in danger.").

Doe's allegations suggest that, at times, school employees did not take seriously enough his and his mother's complaints about bullying, and at times downplayed reports of harassment. These allegations, however, do not rise to the level of a violation of due process. Because Doe's allegations are insufficient to show a special relationship, a state-created danger, or egregious and outrageous conduct, Doe fails to state a claim for violation of substantive due process, and Counts One and Two are dismissed. Therefore, it is unnecessary to consider whether individual defendants had qualified immunity or whether the Board was liable under *Monell*. *Campbell v. Brentwood Union Free Sch. Dist.*, 904 F. Supp. 2d 275, 282 (E.D.N.Y. 2012); *Spring*, 2015 WL 5793600, at *4 ("absent an underlying constitutional violation, a *Monell* claim against a municipality cannot lie").

### 2.   Equal Protection Clause (Counts Three and Four)

In Counts Three and Four, Doe alleges that the individual Defendants and the Board, respectively, violated the Equal Protection Clause of the Fourteenth Amendment by treating Doe differently from other students based on his gender and disability. (FAC ¶¶ 118-46.) Specifically, Doe alleges that Defendants violated the Equal Protection Clause by "failing to take adequate steps to prevent or deter" harassment, by dismissing such conduct as "horseplay" and "boys being boys" (*id.*¶ 124), and providing Doe with a lower level of protection compared to other students at THS because of his disability and gender. (*Id.* ¶ 125.) Doe alleges that as a result of Defendants' conduct, Doe suffered invasions of bodily integrity, physical injury, indignity, "humiliation, severe emotional distress and mental anguish." (*Id.* ¶¶ 135, 146.)

The Equal Protection clause of the Fourteenth Amendment "requires that the government treat all similarly situated people alike." *Harlen Associates v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). "To succeed on an equal protection claim in the harassment context, a student

must show that he was afforded a lower level of protection as opposed to other students, and that this lower level of protection was the result of his [protected status]." *Spring*, 2015 WL 5793600, at *7 (internal quotation marks and citations omitted).

The amended complaint does not make factual allegations that support an inference that Defendants intentionally treated Doe differently because of his learning disability or his gender. Doe's complaint simply states, in a conclusory manner, that "Doe received a lower level of protection as compared with other students at Torrington High School because of his learning disability and his gender . . . ." (FAC ¶ 126.) Doe alleges no facts suggesting that similarly situated girls or non-disabled students were treated differently than Doe. *See Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 237 (E.D.N.Y. 2015) (dismissing claim where plaintiff "does not offer any non-conclusory assertions that the Defendants discriminated against him because of his disability nor does he point to any similarly-situated students who were treated differently"); *see Smith*, 226 F. App'x at 63 (summary order) ("affirm[ing] the district court's dismissal of Plaintiffs' equal protection claim, because the amended complaint nowhere alleges that Defendants, in condoning or acquiescing in the students' mistreatment of Jeremy, were *motivated* in any way by Jeremy's size or ADHD").

Doe's amended complaint alleges that the Defendants failed to discipline sufficiently "students who were actively and regularly committing physical assault, and who had committed sexual assault against . . . Doe, forcing Doe to remain in proximity to violent perpetrators. Conversely, students having committed sexual assault against females were expelled from school." (FAC ¶ 127.) Doe alleges that two members of the THS football team were arrested for rape of female victims in November 2011, and both were expelled from THS for one year following their arrests. (*Id.* ¶ 24.) Again, in February 2013, two members of the THS football team "were arrested on charges of felony sexual assault of two 13-year old females," and were expelled from THS for

one year. (*Id.* ¶ 56.) But Doe does not allege any facts suggesting that he was similarly situated to the female victims, and the allegations suggest that he was not. Doe did not report Student B's sexual assault against him to the police until April 2013, and to THS and the Board until a week or two later. Further, there are no allegations in the amended complaint about when Student B was arrested or what, if any, discipline he received from THS after his arrest. Beginning in the end of April, Doe was not attending THS; instead, he was receiving tutoring at the offices of the Board. By the time Student B was convicted of charges related to the sexual assault in September 2014, Doe was no longer attending Torrington public schools, having moved to another town in July 2013. (*See id.* ¶ 83-4.)

Doe also asserts that the Defendants violated his equal protection rights by displaying "deliberate indifference" to the bullying other students were inflicting on him. To establish liability under this theory, "a plaintiff must show that the defendant's indifference was such that the defendant intended the discrimination to occur." *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999). "[I]n cases of alleged student-on-student harassment, only deliberate indifference to such harassment can be viewed as discrimination by school officials themselves." *Id.* at 140 (*citing Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 642 (1999)). "[D]eliberate indifference can be found when the defendant's response to known discrimination 'is clearly unreasonable in light of the known circumstances.'" *Gant ex rel. Gant*, 195 F.3d at 141 (*citing Davis Next Friend LaShonda D.*, 526 U.S. at 648) (internal citations omitted). The *Gant* Court borrowed the "deliberate indifference" standard from the U.S. Supreme Court's decision in *Davis*, which examined Title IX and concluded that "a private damages action [under Title IX] may lie against the school board in cases of student-on-student harassment. . . . only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities." *Davis Next Friend LaShonda D.,* 526 U.S. at 633.

> Thus, to succeed on a § 1983 equal protection claim of deliberate indifference to student-on-student . . . harassment, the plaintiff must prove that: (1) he was harassed by other students based on his disability or gender; (2) such harassment was "actually known" to the Defendant; and (3) Defendant's response to such harassment was so "clearly unreasonable in light of the known circumstances" as to give rise to a reasonable inference that the Defendant intended for the harassment to occur.

*DiStiso v. Cook*, 691 F.3d 226, 241 (2d Cir. 2012) (internal citations omitted).

The "deliberate indifference" standard does not require a particular disciplinary action.

*Davis Next Friend LaShonda D.*, 526 U.S. at 648 (noting that "courts should refrain from second-guessing the disciplinary decisions made by school administrators" and disagreeing that school "administrators must engage in particular disciplinary action"). It is not a "mere reasonableness standard," and it is one that courts may apply as a matter of law. "In an appropriate case, there is no reason why courts, on a motion to dismiss . . . could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649; *see KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, No. 12 CIV. 2200 ER, 2013 WL 177911, at *8 (S.D.N.Y. Jan. 16, 2013) *aff'd KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, 531 F. App'x 132, 134 (2d Cir. 2013) (dismissing plaintiff's Title IX claim because she failed to set forth facts sufficient to show that school acted with deliberate indifference in responding to the incidents of sexual assault).

The allegations in the amended complaint are not sufficient to state an equal protection claim for deliberate indifference. The allegations suggest that, when Doe reported incidents of bullying and harassment, school officials generally addressed them by providing some support for Doe or disciplining the offending students. After the incident in October 2011, the school suspended Student A. (FAC ¶¶ 19-20.) In the spring of 2012, the school punished Doe and Student D for hitting each other by giving them both ISS. (*Id.* ¶ 31.) In September 2012, DeZurik contacted Doe's mother to inform her that she was aware of harassment against Doe but would not take direct action because Doe did not provide the perpetrators' names. (*Id.* ¶ 46.) In January of 2013, school officials met to discuss the bullying, offered to provide Doe counseling, and developed a safety plan that

20

allowed him to leave resource study hall early. (*Id*. ¶ 54.) An incident of pushing between Doe and Student F resulted in no discipline because the teacher who witnessed it determined that it was mutual, as both boys had hit each other. (¶ 59.) Finally, in April of 2013, after learning that Doe had been sexually assaulted by Student B during the summer of 2012, the superintendent offered that Doe could receive tutoring at the offices of the Board. Thus, the amended complaint fails to allege sufficiently that Defendants' responses to the harassment and bullying were "clearly unreasonable in light of the known circumstances."

Because the amended complaint fails to allege sufficiently that the Defendants were deliberately indifferent, and also because, as discussed below, the amended complaint fails to allege sufficiently that Doe was bullied by other students because of his disability or gender, Doe fails to state claims for violations of the Equal Protection Clause, and I grant Defendants' motion to dismiss Counts Three and Four.

### 3.   Section 504 and Title II of the ADA (Counts Five and Six)

Plaintiffs assert disability discrimination claims against the Board under Title II of the ADA and Section 504 of the Rehabilitation Act, which "protect disabled persons from discrimination, both intentional and unintentional, in the provision of public services." *K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.*, 381 F. Supp. 2d 343, 357 (S.D.N.Y. 2005) (*citing Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 146 (2d Cir. 2002)). Title II of the ADA applies to public entities and provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance . . . ." 29 U.S.C. § 794(a). Claims under Title II of the ADA and Section 504 "are analyzed identically." *Preston v. Hilton Cent. Sch. Dist.*, 876 F. Supp. 2d 235, 241 (W.D.N.Y. 2012) (*citing Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)).

To establish a *prima facie* case of discrimination under the ADA or Section 504, a plaintiff must show "(1) that [he] is a qualified individual with a disability; (2) that the defendants are subject to [the pertinent statute]; and (3) that [he] was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of [his] disability." *Preston*, 876 F. Supp. 2d at 241(*quoting Harris v. Mills*, 572 F.3d 66, 74 (2d Cir. 2009)). "A plaintiff may recover money damages under the ADA or Section 504 by showing a statutory violation resulted from 'deliberate indifference' to the rights secured the disabled by those statutes." *K.M. ex rel. D.G.*, 381 F. Supp. 2d at 358 (*citing Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 115 (2d Cir. 2001)); *see Bartlett v. N.Y. State Bd. of Law Examiners,* 156 F.3d 321, 331 (2d Cir.1998) (intentional discrimination under the Rehabilitation Act may be inferred from "at least deliberate indifference to the strong likelihood that a violation of federally protected rights will" occur), *vacated on other grounds,* 527 U.S. 1031 (1999).

The Board does not dispute that Doe is a qualified individual with a disability or that the Board is subject to the ADA and Section 504. Instead, the Board argues that the amended complaint does not "support a claim of intentional discrimination, animus or deliberate indifference to plaintiff's status as a disabled person." (ECF No. 15 at 22.) I agree.

First, the amended complaint is devoid of non-conclusory allegations that the bullying of Doe was based on his disability. *Eskenazi-McGibney*, 84 F. Supp. 3d at 232 ("Simply because a disabled person was bullied does not, without more, compel the conclusion that the bullying was 'based on [JEM's] disability.'"). Doe alleges that while he was in resource study hall on April 1,

2013, he tried to shield himself from the view of the hallway "in order to avoid the ridicule of other students for requiring services for his special needs." (FAC ¶ 62.) Doe also alleges that Defendants knew that he "suffered from a Specific Learning Disability which limited his ability to defend himself against his peers' abusive conduct" (*Id*. ¶ 91) and made him "especially vulnerable to harassment, bullying and assault." (*Id*. ¶ 95.) Finally, Doe alleges that Defendants relied on Doe "to advocate on his own behalf when they knew he was unable to do so as a result of his disability." (*Id*. ¶¶ 153, 166.) Doe does not sufficiently allege, however, that anyone actually harassed, bullied, or assaulted him *because of* his disability or perceived disability, rather than some other reason, such as personal animus.

> [E]ven if students with disabilities are more likely to be bullied than students without disabilities, both based on their disabilities and based on other factors, a plaintiff nevertheless does not state a claim under the ADA and Section 504 absent some factual allegation linking the disability and the bullying. To hold otherwise would convert the ADA and Rehabilitation Act into generalized anti-bullying statutes.

*Eskenazi-McGibney*, 84 F. Supp. 3d at 233.

Even if Doe had adequately alleged that the bullying was based on his disability, his ADA and Section 504 claims would still fail, because he does not sufficiently allege that the Board acted with deliberate indifference. As discussed above, the allegations suggest that, when Doe reported incidents, school officials generally addressed them by providing some support for Doe or disciplining the offending students. Unlike other cases in which courts have denied motions to dismiss ADA and Section 504 claims, here, there was not a "complete failure to address bullying." *J.R. v. New York City Dep't of Educ.*, No. 14 CIV. 0392 ILG RML, 2015 WL 5007918, at *5 (E.D.N.Y. Aug. 20, 2015) (in response to complaints about harassment, principal did not intervene and told student's parents "that the bullying was likely to continue given the violent nature of the student body."); *see also Preston*, 876 F. Supp. 2d at 242 (denying motion to dismiss where parents of bullied student "notified multiple District employees of the ongoing harassment of A.P. by his

peers, through telephone conversations, e-mail correspondence and sit-down meetings, and . . .

those individuals nonetheless failed to act, acquiesced in the harassment of A.P. and imposed no

discipline on A.P.'s harassers.").[4]

Because Doe does not sufficiently allege that: (1) he was bullied because of his disability, or

(2) the Board acted with deliberate indifference, Counts Five and Six are dismissed.

### 4. Title IX (Count Seven)

Doe alleges that the Board subjected him to severe and pervasive "gender based harassment

by his Harassers based upon the belief that harassment amongst boys can be dismissed as

'horseplay.'" (FAC ¶¶ 170, 174.) Such harassment and abuse, Doe alleges, deprived him of the

educational benefits or opportunities of THS, and the Board was deliberately indifferent. (*Id*. ¶174-

75.)

Title IX provides that "no person . . . shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education

---

[4] In a single paragraph of his amended complaint, Doe alleges that, by "removing the Plaintiff from the track team, the [track coach] retaliated against [Doe] for asserting his right to be free from harassment, discrimination and physical assault based on his disability and gender." (FAC ¶¶ 72-73.) It does not appear that Doe intends to state a claim for retaliation because there is no separate retaliation count and no mention of the relevant statutes. *See* 42 U.S.C. § 12203(a). In order to plead a retaliation claim under the ADA and Section 504, a plaintiff must allege that: "(i) [he] was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Spring*, 2015 WL 5793600, at \*12 (*citing Weixel*, 287 F.3d at 148–49). "Advocacy on behalf of a disabled student is 'protected activity' for purposes of Section 504 and the ADA." *J.R.*, 2015 WL 5007918, at \*5. The relevant factual allegation is that the track coach "informed the Plaintiff that he could not continue to participate on the track team because of his grades." (FAC ¶ 72.) But the track coach is not a defendant, and there is no allegation that any of the Defendants were involved in the decision to exclude Doe from the track team. Further, Doe does not allege that he or his mother complained to the track coach or the Board that the bullying and harassment were because of his disability. Thus, Doe has "not adequately alleged 'protected activity' under the ADA and Section 504." *Eskenazi-McGibney*, 84 F. Supp. 3d at 234 (dismissing retaliation claims because although plaintiffs "complained about bullying of JEM, they did not complain that the bullying was on account of JEM's disability").

program or activity receiving Federal financial assistance . . . ." 20 U.S.C. 1681(a). In order to state

a claim for gender-based peer-on-peer harassment under Title IX, a plaintiff "must allege that: (1)

he was harassed on the basis of gender; (2) that the harassment was so severe, pervasive and

objectively offensive that it altered his education; (3) the school district had actual notice of the

gender-based harassment; and (4) the school was deliberately indifferent to it." *Preston*, 876 F.

Supp. 2d at 243 (citations omitted).

Doe does not sufficiently allege that he was bullied, harassed, and assaulted because of his

gender. Doe alleges that his classmates called him "faggot" and a "fat ass" (FAC ¶ 36), and his

football teammates and coaches called him a "pussy," "bitch," and "baby." (*Id.* ¶ 25.) The terms "fat

ass" and "baby," are not associated with gender, and other courts in this Circuit have found that the

terms "pussy," "faggot," and "bitch" are also insufficient to suggest that a student was harassed on

the basis of gender. *See Preston*, 876 F. Supp. 2d at 243 ("the fact that A.P.'s harassers asked him

embarrassing sexual questions and used terms with sexual connotations, such as such as 'gay,'

'homo,' 'faggot' and 'bitch,' is insufficient to suggest that A.P. was harassed on the basis of his

gender . . . ."); *Estate of D.B. by Briggs v. Thousand Islands Cent. Sch. Dist.*, No.

715CV0484GTSATB, 2016 WL 945350, at *8 (N.D.N.Y. Mar. 14, 2016) ("the slur 'pussy' is more

likely to mean 'coward' than anything gender related."); *HB v. Monroe Woodbury Cent. Sch. Dist.*,

No. 11-CV-5881 CS, 2012 WL 4477552, at *17 (S.D.N.Y. Sept. 27, 2012) (finding that student—

who was called names such as "whore" and "bitch," as well as "fucking rat," "dirty spic," and

"gorilla," and "was physically assaulted in a non-gender-specific way" did not plausibly plead that

she was harassed *because of* her gender).

The sexual assault Doe suffered is severe and objectively offensive sexual harassment. *See*

*Kelly v. Yale Univ.*, No. CIV.A. 3:01-CV-1591, 2003 WL 1563424, at *3 (D. Conn. Mar. 26, 2003)

("there is no question that a rape . . . constitutes severe and objectively offensive sexual harassment

under the standard set forth in *Davis*"); *T.P. ex rel. Patterson v. Elmsford Union Free Sch. Dist.*, No. 11 CV 5133 VB, 2012 WL 860367, at *8 (S.D.N.Y. Feb. 27, 2012) ("As to liability against the School District, a single incident of sexual assault may suffice to create liability under *Davis* . . . ."). But the sexual assault occurred outside of school grounds during the summer, and the Board's liability is limited "to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs," *i.e.*, misconduct that occurs during school hours and on school grounds. *Davis Next Friend LaShonda D.*, 526 U.S. at 645-46. Moreover, no one disclosed the sexual assault to THS or the Board until April 17, 2013. (FAC ¶ 77.) On the same day it was disclosed to the Board, Kloczko offered Doe tutoring at the Board offices—away from the students who had been bullying and assaulting him—which he began on April 23. (*Id*. ¶ 81.) Such action is not "clearly unreasonable."

Because the allegations in the amended complaint do not sufficiently allege that Doe was harassed or assaulted on the basis of gender, or that—even if he was—the Board was deliberately indifferent (*see Supra* Part III.A.2.), Count Seven is dismissed.

### B.  State Law Claims

The Court declines to exercise supplemental jurisdiction over Doe's state law claims. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); 28 U.S.C. § 1367(c)(3). Counts Eight, Nine, Ten, Eleven, Twelve, Thirteen, and Fourteen are therefore dismissed without prejudice to refiling them in state court.

## IV.    CONCLUSION

The Court GRANTS Defendants' motions to dismiss. Counts One through Seven are dismissed with prejudice, and the state claims, Counts Eight through Fourteen, are dismissed

without prejudice to refiling them in state court. The Clerk is directed to enter judgment dismissing

this case.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              March 30, 2016