## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN DOE, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | No. 3:15-cv-00452 (MPS) |
| | : | |
| TORRINGTON BOARD OF EDUCATION, | : | |
| GERARD CARBONE, JOANNE CREEDON, | : | |
| JOHANNA DEZURIK, DANIEL DUNAJ, JAMES | : | |
| DZIEKAN, CHERYL KLOCZKO, MICHAEL | : | |
| MCKENNA, and CHARLES MCSPIRITT | : | |
| | : | |
| Defendants. | : | |

## RULING ON RENEWED MOTIONS TO DISMISS

Plaintiff John Doe filed this lawsuit against the Torrington Board of Education (the "Board") and several Board employees, on March 27, 2015. Doe alleges that as a student and member of the football team at Torrington High School, he experienced verbal abuse, physical attacks, and sexual assault by other students. He claims that defendants failed to adequately respond to and prevent this bullying, and condoned a culture of harassment and violence. After initially dismissing the case, the Court granted Doe's motion to reconsider and allowed him to file a second amended complaint. Defendants have now filed renewed motions to dismiss. As explained more fully below, the motions to dismiss (ECF Nos. 95; 96) are GRANTED in part and DENIED in part. The claim of intentional infliction of emotional distress (Count Four) is dismissed as to all defendants but former football coach Daniel Dunaj. The case may proceed as to the substantive due process, state-created danger claim against Dunaj (Count One), the state law negligence claims against all defendants (Counts Two, Three, and Five), and the intentional infliction of emotional distress claim against Dunaj (Count Four).

## I. FACTUAL ALLEGATIONS

According to the allegations in the second amended complaint, Plaintiff John Doe was a student at Torrington High School in Torrington, Connecticut, from August 2011 until April 2013. (ECF No. 91 ¶ 14.) During that time period, Defendant Cheryl Kloczko was Superintendent of the Torrington Board of Education, Defendant Joanne Creedon was Principal of Torrington High School, and Defendant Charles McSpiritt was Vice Principal. (*Id.* ¶¶ 2-5.)

While a student at Torrington High School, Doe was a member of the football and track teams. (*Id.* ¶¶ 17, 46.) Defendant Daniel Dunaj was the head football coach, and Defendant Michael McKenna was the athletic director. (*Id.* ¶¶ 6-7.) As a student with a learning disability, Doe was entitled to certain services and accommodations at Torrington High School. (*Id.* ¶ 15.) At all relevant times, Defendant Gerard Carbone was Doe's school special education case manager, Defendant James Dziekan was the school social worker assigned to counsel Doe, and Defendant Johanna DeZurik was his school guidance counselor. (*Id.* ¶¶ 8-10.)

### A. Dunaj's Prior Employment

Before working at Torrington High School, Dunaj was a teacher and coach in Seymour, Connecticut. (*Id.* ¶ 18.) From 2004 to 2007, while employed by the Seymour Public Schools, he was the subject of multiple complaints and investigations. (*Id.* ¶ 20.) For example, a female student on the track team filed a complaint against Dunaj for subjecting her to "verbal abuse, humiliation and degradation." (*Id.* ¶ 22.) The student's mother wrote a letter to the editor about the complaint, which Dunaj posted in the boys' locker room, causing the student to be ridiculed and abused. (*Id.* ¶¶ 23-24.) Another complaint alleged that Dunaj had asked a class of students, "What do we call girls who wear tight shorts?" A female student raised her hand and said, "it's the *s* word," to which

Dunaj replied, "yes, sluts and whores." (*Id.* ¶ 30.) Dunaj was hired as the head football coach at Torrington High School in or around the fall of 2008. (*Id.* ¶ 33.)

### B. Incidents Involving Doe

The first incident of harassment of Doe described in the second amended complaint occurred in October of 2011, during the fall semester of Doe's freshman year. (*Id.* ¶ 36.) Student A[1] threw Doe on the floor of the locker room, breaking his glasses, and rubbed Doe's hat in Student A's genitals. (*Id.*) Doe reported the assault, and the school suspended Student A briefly. (*Id.* ¶ 37.) Vice Principal McSpiritt provided a written report of the incident to Principal Creedon, and kept Creedon informed of other reports of bullying and harassment made by Doe. (*Id.* ¶ 38.) Though Doe was assured that this report would be private, staff and students on the football team learned that he had gone to school officials and began to retaliate against him. (*Id.* ¶ 37.)

Next, around late October or early November, 2011, Student B tackled Doe and said he wanted to fight him. (*Id.* ¶ 40.) This occurred in a public place "on school grounds and/or during a school sponsored activity" that "was and/or should have been" supervised by defendants. (*Id.*) Doe did not immediately report this assault, because he "did not feel safe" after the way his prior report had been handled by school staff and coaches. (*Id.* ¶ 42.) His mother later reported the assault to school administrators. (*Id.* ¶ 43.)

In January 2012, after Doe had sustained an injury that limited his ability to play football, coaches and students, including Student I, ridiculed him and called him "pussy," "bitch," and "baby." (*Id.* ¶ 45.) Coach Dunaj "witnessed, participated in, encouraged, and condoned this harassment." (*Id.*)

---

[1] The parties did not use the minor students' names to protect their privacy.

In the spring of 2012, during track practice, Student C, a member of both the football and track teams, threw Doe on the ground and threw rocks in Doe's face, one of which he swallowed. (*Id.* ¶ 46.) Again, this occurred "on school grounds and/or during a school sponsored activity in a public place that was and/or should have been supervised" by defendants. (*Id.*) Doe did not immediately report this assault, but his mother later reported it to school administrators. (*Id.* ¶ 48.) From that point until the end of Doe's freshman year, Doe was assaulted by Student C or other students on school grounds and/or during school sponsored activities nearly every day. (*Id.* ¶ 49.) (Student C had himself been a victim of bullying: he reported to police that he quit football "from being bullied by the coaches and kids." (*Id.* ¶ 50.))

Also in the spring of 2012, Student D hit Doe on the back of the neck in a "karate chop." (*Id.* ¶ 53.) Doe hit back, and both students received in-school suspensions. (*Id.*) Coach Dunaj informed the team of Doe's suspension, and disciplined the entire team for it by forcing them to run sprinting exercises called "gassers." (*Id.* ¶ 54.) The second amended complaint alleges that Dunaj was "aware that the policy of requiring the entire team to run gassers as a result of one student's discipline would encourage players to retaliate within the team, and encourage escalating incidents of bullying, harassment and assaults." (*Id.* ¶ 55.) Dunaj's discipline resulted in more physical assaults on Doe, including Students C, E, and other members of the football team seeking Doe out after practice and striking him repeatedly on the neck. (*Id.* ¶¶ 55-56.) Later, in fall 2012, defendants were informed that this sort of team punishment for suspensions was resulting in physical assaults, and that the coaches knew this. (*Id.* ¶ 82.)

During the summer, in August 2012, Doe and other students were playing football in a park. (*Id.* ¶ 57.) Student B, in the presence of other students, sexually assaulted Doe. (*Id.*) Doe "did

not feel safe" to report this incident to anyone immediately after it happened. (*Id.* ¶ 58.) (Student B was later convicted of sexual assault, in September 2014. (*Id.* ¶ 128.))

When Doe's sophomore year began in fall of 2012, he was repeatedly harassed in class, including being called a "faggot" and "fat ass" by other students. (*Id.* ¶ 59.) Though teachers heard the harassment, they did not discipline the other students. (*Id.*) Doe's attendance and grades began to suffer. (*Id.* ¶ 85.)

In September 2012, Guidance Counselor DeZurik left a voicemail for Doe's mother indicating that she was aware of harassment against Doe but would not take action because Doe had not offered names. (*Id.* ¶ 84.) DeZurik and other defendants did not investigate. (*Id.*) In November 2012, Doe's mother requested a meeting to address the bullying and other issues. (*Id.* ¶ 86.) At the meeting, Case Manager Carbone "became visibly agitated with and angry at" Doe, stating "I am sick of hearing about phantom bullies." (*Id.* ¶ 87.) Doe then provided some of the names of the perpetrators. (*Id.* ¶ 88.) Defendants also received reports that "coaches sometimes encourage the violence as the coaches are verbally mean to the players-which makes the players verbally mean to the lower classman [sic]." (*Id.* ¶ 81.) Defendants did not investigate these reports. (*Id.*)

After the November meeting, the bullying continued. (*Id.*) In December 2012, defendants honored various students at the Torrington High School football banquet, seven of whom had been identified as responsible for hazing and bullying against other students. (*Id.* ¶ 89.) Among the students honored were Students B, E, and I, all of whom had bullied Doe. (*Id.*)

In January 2013, Doe's mother requested another meeting with defendants to address the harassment of Doe. (*Id.* ¶ 93.) At this meeting, which Doe's private counselor and his grandmother also attended, Guidance Counselor DeZurik, Vice Principal McSpiritt, and Case Manager Carbone

described the harassment as "everyday banter between the boys, back and forth." (*Id.* ¶¶ 94-95.) With Doe's mother in tears, and the private counselor and grandmother objecting to this characterization, defendants offered Doe 30 minutes of counseling per week with Dziekan to "help him learn certain skills to assist him in dealing with issues related to his peers because of his 'sensitivity.'" (*Id.* ¶¶ 95-96.) Though Doe requested that Dziekan speak with his private counselor regarding the harassment, Dziekan never contacted her. (*Id.* ¶ 97.) Dziekan also did not meet with Doe as required. (*Id.* ¶ 103.) (Later, Dziekan stated that "he felt that the use of the word 'bullying' was overused" and he was unable to provide the required services to Doe because "his caseload of students grows every day and he is unable to meet with every student he is supposed to." (*Id.* 104.))

On or about March 17, 2013, Doe's mother attended another meeting at Torrington High School, where she "pleaded for help to end the bullying, assault and harassment." (*Id.* ¶ 100.) Also on or about March 17, 2013, Student F, unprovoked, pushed Doe in the chest and said "What the fuck, gay boy." (*Id.* ¶ 101.) Doe, defending himself, pushed Student F. (*Id.*) A teacher witnessed this but "dismissed it as mutual," and took no action. (*Id.*) The next day, Doe's mother told Carbone that Doe was afraid to go to school, and two days later, she called Dziekan about the bullying. (*Id.* ¶¶ 102-03.)

On April 1, 2013, Doe was in a resource study hall for special education students. When the paraprofessional opened the blinds, he turned his desk so students in the hall couldn't see. (*Id.* ¶ 105.) The paraprofessional, noticing this, said, "What? Are you embarrassed? You should be embarrassed. About the only thing you should be embarrassed about is yourself. You are a hider." (*Id.* ¶ 106.) Other students then started calling Doe a "hider." (*Id.*) The paraprofessional also suggested that the other students get paint and write Doe's name on the window, and when Doe requested to leave early to avoid his harassers, she asked the class "Don't you wish you could"

leave early, and stated "we should all go to our Guidance Counselors so we can leave early." (*Id.* ¶ 107.) Another teacher reported this incident to Case Manager Carbone. (*Id.*)

Later on April 1, Student B and Student C cornered Doe at track practice, pushed him against a fence, and punched him repeatedly, producing contusions and causing his shirt to rip. (*Id.* ¶ 109.) The next day, on April 2, 2013, Doe's mother informed Vice Principal McSpiritt about the incident and Doe disclosed the names of Students B and C. (*Id.* ¶ 110.) On or about April 2, 2013, the track coach called Doe's mother to say that Doe was "embellishing" his complaints and McSpirrit dismissed the incident as "mutual 'horseplay.'" (*Id.* ¶¶ 111-12.) Principal Creedon told Doe's mother that she was aware that student athletes were being left unsupervised. (*Id.* ¶ 113.) On April 5, 2013, the track coach informed Doe that he would have to leave the team because of his grades, even though another student with similar grades was allowed to stay on the team. (*Id.* ¶ 115.)

On April 5, 2013, Doe and a state trooper told Doe's mother about the sexual assault by Student B the previous summer. (*Id.* ¶ 117.) Doe's mother removed Doe from school. (*Id.*) After further meetings, in which defendants were also informed of the prior sexual assault, on April 23, 2013, Doe began tutoring at the Torrington Board of Education (the same program offered to students who are expelled). (*Id.* ¶¶ 118-25.) At a meeting in June 2013, defendants "denied any incidents of bullying, harassment, or retaliation." (*Id.* ¶ 127.) The defendants never reported any of the incidents to the police or Department of Children and Families, or told Doe's mother she had a right to do so. (*Id.* ¶ 130.)

In July 2013, Doe's mother moved the family out of Torrington so that Doe could enroll in another school. (*Id.* ¶ 126.)

### C. Incidents Involving Other Students

Beyond the incidents involving Doe specifically, the second amended complaint also details assault and harassment against other students, and alleges a "culture of harassment and violence created by staff and administrators" at Torrington High School. (*Id.* at 1.) In 2008, before Doe entered Torrington High School, the football quarterback held down Victim 1, a freshman on the team, and put the eraser of a pencil in his rectum. (*Id.* ¶ 35.) This ritual came to be known as the "Quarterback Initiation," and defendants were informed of it in fall of 2012. (*Id.* ¶¶ 35, 65, 66.)

In fall of 2011, during Doe's freshman year, two students on the football team, Student W and Student X, were arrested on charges of rape. (*Id.* ¶ 44.) School administrators were aware of the arrests, and the two students were expelled for one year. (*Id.*)

In March 2012, Student Y and three other Torrington football players "jump[ed]" three fourteen year old boys. (*Id.* ¶ 51.) Though Student Y was charged with felony robbery, he was allowed to play on the team in fall 2012 and was awarded "Most Valuable Player." (*Id.*)

In fall of 2012, defendants "were informed of other significant and severe acts of hazing, harassment, physical assault[,] and sexual assault among players on the football team." (*Id.* ¶¶ 60-61.) In one example, defendants were informed that a student was sexually assaulted in the locker room and had items forced into his mouth—then they asked the student's parents not to report this incident to the police. (*Id.* ¶¶ 62-63.) In another example, defendants were informed that Student B had grabbed the genitalia of a freshman while he had "icy-hot cream" in his hand, while two other students held him down. (*Id.* ¶ 78.) At least one (un-named) coach knew of this assault, but responded only by telling the students, "just don't mount each other." (*Id.* ¶ 79.) Student B received no discipline. (*Id.* ¶ 80.)

Also in fall of 2012, defendants were informed that Victim 1, who had been a victim of the "Quarterback Initiation" as a freshman in 2008, hazed a new freshman, Victim 3, in front of multiple other football players in the locker room. (*Id.* ¶ 67.) Victim 1 forced Victim 3 to choose between sucking the toe of another senior football player or having a pencil put in his rectum. (*Id.*) In response to this report, administrators determined that there should be a two-game suspension, but the team was not in fact suspended for any games. (*Id.* ¶ 73.) Four students were suspended for five days, and suspended from two football games, but no students were expelled. (*Id.* ¶ 74.) According to one source, defendants gave this "minimal" discipline "because any more time would have cost [the students] their college scholarships." (*Id.* ¶ 77.) Further, when a trainer sent an email about the incident, a member of the football coaching staff commented "nice email." (*Id.* ¶¶ 70-72.) Defendants "failed to investigate whether this comment, occurring only days after disclosure of severe acts of hazing, indicated a larger pattern of retaliation, or propensity by Torrington athletic staff to hide information about such incidents." (*Id.* ¶ 72.)

Finally, in February 2013, two football team members, Student Y and Student P, sexually assaulted two 13-year-old girls. (*Id.* ¶¶ 52, 98.) Students E, Q, and M then bullied the 13-year-old girls on social media. (*Id.* ¶ 99.) Students Y and P were arrested and expelled from Torrington High School for one year. (*Id.* ¶ 98.)

## II.    PROCEDURAL HISTORY

Doe initiated this case on March 27, 2015, against the Torrington Board of Education and eight Board employees. In his first amended complaint, Doe brought seven federal claims and seven state law claims. (ECF No. 22.) On March 30, 2016, the Court granted defendants' motions to dismiss, holding that Doe had failed to allege sufficient facts as to all federal law claims, and declining to exercise supplemental jurisdiction over the state law claims. (ECF No. 75.) On April

28, 2016, Doe filed a motion urging reconsideration of the federal substantive due process claim based on newly discovered. (ECF No. 79.)

On November 17, 2016, the Court granted Doe's motion for reconsideration in part, holding that "the newly discovered evidence presented by Doe is sufficient to state a plausible claim that Dunaj, and Dunaj only, is liable for violating Doe's substantive due process rights under a theory of state-created danger." (ECF No. 90 at 5.) The Court allowed Doe to file a second amended complaint, incorporating the newly discovered evidence described in his motion for reconsideration, repleading the federal substantive due process claim against Dunaj based on a theory of state-created danger, and repleading any of the state law claims over which the Court had previously declined to exercise supplemental jurisdiction. (*Id.* at 9-10.)

Doe filed a second amended complaint on December 8, 2016, supplementing his factual allegations and repleading the federal due process claim against Dunaj (Count One) as directed by the Court. He also repled four state law claims: negligence against all defendants (Count Two), negligent hiring, retention, and supervision against all defendants (Count Three), intentional infliction of emotional distress against the individual defendants (Count Four), and negligent infliction of emotional distress against all defendants (Count Five).[2] Defendants Dunaj and McKenna filed an amended motion to dismiss[3] the second amended complaint on December 21, 2016 (ECF No. 95), and the remaining defendants filed a motion to dismiss on December 22, 2017. (ECF No. 96.)

---

[2] The second amended complaint also included state law claims under Conn. Gen. Stat. §§ 46a-64, 10-15(c), and 46a-58(a) (Counts Six-Eight), but Doe has since withdrawn those claims. (ECF Nos. 99 at 37; 100 at 2, n.2.)

[3] In light of this amended motion to dismiss, Dunaj's and McKenna's initial motion to dismiss (ECF No. 94) is DENIED as moot.

## III. LEGAL STANDARD

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), I take the plaintiffs' factual allegations in the complaint "to be true and [draw] all reasonable inferences in" their favor. *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court need not accept legal conclusions as true and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## IV. DISCUSSION

### A. Due Process Claim (Count One)

Defendant Dunaj argues that the due process count against him should be dismissed for failure to state a claim under a theory of state created danger.[4] The Court disagrees.

The Court already held that the newly discovered evidence presented in Doe's motion for reconsideration—which is now incorporated into the second amended complaint—sufficiently stated a due process claim. Specifically, the Court ruled that "the newly discovered evidence presented by Doe is sufficient to state a plausible claim that Dunaj, and Dunaj only, is liable for violating Doe's substantive due process rights under a theory of state-created danger." (ECF No. 90 at 5.) The Court explained that "the new evidence is sufficient to allege that Dunaj 'plainly

---

[4] Dunaj also objects to Doe's including extraneous allegations that could implicate previously dismissed legal theories. However, even if Doe did include extraneous allegations, that would not be grounds for dismissal of the state-created danger claim. Doe has acknowledged, and the Court reiterates, that the sole remaining federal claim in this case is a substantive due process claim against Dunaj based on a theory of state-created danger. (*See* ECF No. 99 at 1-2, n.1.)

transmitted the message' that what the students did 'was permissible and would not cause [them] problems with authorities,' and further that these alleged actions were 'egregious.'" (ECF No. 90 at 6, *quoting Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 430-31 (2d Cir. 2009).) The Court sees no reason to depart from its earlier decision. "[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless cogent and compelling reasons militate otherwise." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (citations and quotation marks omitted).

### B. Negligence Claims (Counts Two, Three, and Five)

Defendants argue that they are immune from liability on the three negligence counts under Conn. Gen. Stat. § 52-557n and Connecticut common law. Municipal boards of education and municipal officials, such as defendants, are generally shielded from "liability for damages to person or property caused by the negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." *Coley v. City of Hartford*, 312 Conn. 150, 161 (2014) (quotation marks omitted). Here, the Court agrees with defendants that the alleged acts and omissions were discretionary, but finds that Doe has stated a plausible claim under the "identifiable victim, imminent harm" exception to discretionary act immunity. Therefore, at the pleadings stage, Doe's negligence claims survive.

*1. Ministerial vs. Discretionary Functions*

"It is well settled that municipal employees are immune from liability for negligence arising out of their discretionary acts." *Strycharz v. Cady*, 323 Conn. 548, 564-65 (2016) (citation and quotation marks omitted). However, "municipal employees are not immune from liability for negligence arising out of their ministerial acts, which are defined as acts to be performed in a

prescribed manner without the exercise of judgment or discretion." *Id.* at 565 (citation, quotation marks, and alterations omitted).

Connecticut courts have held that the types of acts and omissions alleged in this case are discretionary. In Count Three, Doe alleges that defendants negligently failed to provide proper training to counselors and administrators. (ECF No. 91 ¶ 160.) The "general responsibility to manage and supervise school employees" is discretionary, not ministerial. *Strycharz,* 323 Conn. at 569. Doe also alleges that defendants failed to adopt policies to prevent and prohibit bullying and harassment. (ECF No. 91 ¶ 159.) "[T]he act of promulgating a policy… is a discretionary activity. A policy, by definition, is a definite course or method of action selected from among alternatives to guide and determine present and future decisions." *Heigl v. Bd. of Educ. of Town of New Canaan*, 218 Conn. 1, 5-6 (1991) (quotation marks and alteration omitted). Finally, in Counts Two and Five, Doe alleges that defendants "negligently fail[ed] to prevent, investigate and punish bullying, harassing and assaultive behavior by his peers" and failed to provide "a safe environment at Torrington High School." (ECF No. 91 ¶¶ 151, 171.) Supervising students is also a discretionary duty, as it requires the exercise of judgment. *See Doe v. Bd. of Educ. of City of New Haven*, 76 Conn. App. 296, 300 (2003) ("The plaintiff does not dispute that the duty allegedly breached in the present case, namely, the duty of the defendant to supervise students, is a discretionary, governmental duty."); *Silano v. Bd. of Educ. of City of Bridgeport*, 52 Conn. Supp. 42, 53 (Super. Ct.) ("[I]t cannot reasonably be disputed that the duties of the employees of a board of education, in supervising and disciplining students, are inherently discretionary, involving the use of judgment and the choice between alternative courses of action.") (collecting cases) (citation and quotation marks omitted), *aff'd*, 129 Conn. App. 682 (2011).

Doe nonetheless argues that defendants failed to comply "with statutes regarding, inter alia, reporting of criminal offenses and child abuse, and requirements related to ensur[ing] a school climate safe from sexual and physical assault and bullying [, which] are ministerial in nature." (ECF No. 91 ¶ 150.) However, Doe does not identify the specific statutes in question in his second amended complaint or in his responses to the motions to dismiss.[5] Without such information, the Court is unable to review the language of the alleged statutes to determine whether they in fact create ministerial duties, or whether they leave the defendants with discretion in carrying out their responsibilities. *See, e.g. Ugrin v. Cheshire*, 307 Conn. 364, 392 (2012) ("None of these comments constitutes a directive to the town giving rise to a ministerial duty because they all contain the qualifying words 'should' or 'could,' which indicate that the town had discretion to exercise its judgment."). The Court is left only with Doe's conclusory allegation that the statutes exist and are "ministerial."[6]

### 2. Identifiable Victim, Imminent Harm

Even though the defendants engaged in discretionary acts, there is an exception to immunity when "the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm." *Strycharz,* 323 Conn. at 573 (citation and quotation marks omitted). This "identifiable person, imminent harm" exception

---

[5] Earlier in the second amended complaint, Doe does cite Conn. Gen. Stat. § 10-222h. (ECF No. 91 ¶ 83.) However, this statute is not a directive to town boards of education or their employees, but rather directs "the Department of Emergency Services and Public Protection, in consultation with the Department of Education" to "develop school security and safety plan standards." Conn. Gen. Stat. § 10-222h.

[6] Doe cites a Connecticut Appellate Court decision, *Kumah v. Brown*, 127 Conn. App. 254, 258 (2011), *aff'd* 307 Conn. 620 (2013), for the proposition that he did not need to include specific statutes in his complaint. However, whether or not this would be correct in a case in state court, *see, e.g. Elbiona v Best PPA Elbert Best v. City of Hartford*, 2015 WL 7941689, at 3 (Conn. Super. Ct. 2015), it is irrelevant here, as state law pleading standards do not apply in federal court.

"requires three things: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." *Id.* at 573 (citation and quotation marks omitted). The plaintiff must prove all three prongs with respect to each defendant. *Id.* Here, defendants have not argued that the allegations are inadequate as to particular defendants, but instead have made a broad brush argument as to all defendants. I examine Doe's allegations under each of the three prongs below.

First, I find that the allegations adequately plead imminent harm. For harm to be imminent, "the dangerous condition [must be] so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to prevent the harm." *Haynes v. City of Middletown*, 314 Conn. 303, 323 (2014). Defendants argue that because the harassment of Doe took place over an extended time period and could have occurred at various locations and times, harm was not imminent, citing a Connecticut Appellate Court case from 2003, *Doe*, 76 Conn. App. 296. However, in 2014, the Connecticut Supreme Court overruled earlier case law and rejected the view that "imminent harms are harms that *can only* happen in the immediate future because they arise from temporary conditions," cautioning that a court should "not focus[] on the *duration* of the alleged dangerous condition, but on the *magnitude of the risk* that the condition created." *Haynes*, 314 Conn. at 320, 322 (emphasis in original). *See also Strycharz*, 323 Conn. at 586-87 (interpreting *Haynes*); *Williams v. Hous. Auth. of City of Bridgeport*, 159 Conn. App. 679, 702 (2015) (reversing trial court decision where the court had applied incorrect, pre-*Haynes* test in concluding that there was no imminent harm because "the plaintiff did not identify 'a discrete time and place period at which the harm would occur' that was foreseeable to the defendants.") In this case, although the harassment of Doe allegedly occurred over a period of two years and in different locations, the

magnitude of the risk associated with repeated beatings was sufficient to create an imminent harm. (*See, e.g.* ECF No. 91 ¶¶ 36, 40, 43, 46, 45, 48, 53, 54, 59.)

Second, "student[s] in a public school," such as Doe, have been recognized by the Connecticut Supreme Court as "a class of identifiable persons." *Haynes v. City of Middletown*, 314 Conn. 303, 311 (2014) (citing *Burns v. Board of Education*, 228 Conn. 640, 649 (1994)). *See also Strycharz,* 323 Conn. at 576 ("[I]t is inarguable that the plaintiff became a member of the identifiable class of foreseeable victims when he arrived at school on the school bus: he was a fourteen year old child enrolled in a public school, his attendance was legally required, and his parents were statutorily mandated to relinquish their protective custody to school officials.") The Connecticut Supreme Court has further held that "school officials may be held liable for injuries occurring off school grounds if the officials' negligence on school property was the proximate cause of the injuries." *Id.* at 578.

Third, the second amended complaint pleads enough facts to make it plausible that it was apparent that the defendants' failures to act more decisively to stop the bullying of Doe would subject him to harm. "[T]he applicable test for the apparentness prong of the identifiable person-imminent harm exception is an objective one." *Strycharz,* 323 Conn. at 589. "[T]he plaintiff [is] not required to prove actual knowledge on the part of the defendants… we do not ask whether the school official *actually knew* that harm was imminent but, rather, whether the circumstances would have made it apparent to a *reasonable school official* that harm was imminent." *Id.* at 589 (citation, quotation marks, alterations omitted, emphasis added). In this case, while the allegations might not be sufficient to state that defendants were aware of imminent harm from particular students the first or second time Doe was attacked, by the fourth or fifth time—with all the verbal harassment of Doe and the continuing culture of condoning violence by student athletes—one can infer that

the harm would have been apparent to a reasonable school official. Doe alleges, for example, that defendants knew of bullying and assaults occurring within the school, including rapes of two female students in November 2011, a culture of bullying and hazing, and assaults such as a football player having a pencil eraser placed in his rectum. (ECF No. 91 ¶¶ 44, 65.) Doe also alleges that defendants were aware of the bullying of Doe specifically, such as: being thrown on the floor of the locker room, and having Student A rub his hat in Student A's genitals (*Id.* ¶ 36); being called called "pussy," "bitch," "baby," "faggot," and "fat ass." (*Id.* ¶¶ 45, 59); and being hit in the neck (*Id.* ¶¶ 53-54). Doe's mother also reported other assaults against Doe, including Student B tackling Doe and Student C throwing rocks in his face on school grounds in 2011 and 2012. (*Id.* ¶¶ 40, 43, 46, 48.) When reasonable inferences are drawn in Doe's favor, at least by the time of the final assault on Doe, these "the circumstances would have made it apparent to a reasonable school official that harm was imminent." *Strycharz*, 323 Conn. at 589 (citation, quotation marks, and alteration omitted).

Overall, while defendants have characterized the identifiable victim, imminent harm exception as limited and narrow, in fact, "[t]he rule has been narrowly applied *outside of the public school context*," *Texidor v. Thibedeau*, 163 Conn. App. 847, 862 (2016) (emphasis added), and is well established in the public school context. In *Haynes*, for example, the Connecticut Supreme Court considered whether the identifiable victim, imminent harm exception applied in a public school where "the school had informed students in writing at the beginning of the school year that horseplay in the locker room was prohibited," "school officials knew that horseplay in the locker rooms was an ongoing issue," and "there was evidence that [a broken] locker [had been] in a dangerous condition" for seven months. 314 Conn. at 325. The Court held that a reasonable jury could conclude that "the ongoing problem of horseplay in the locker room and the presence of the

broken locker were so likely to cause an injury to a student that the officials had a clear and unequivocal duty to act immediately to prevent the harm." *Id.* Here, though bullying, like the "horseplay" in *Haynes*, was technically prohibited by the school, it would have been apparent to a reasonable school official that it was nevertheless an "ongoing issue" and "dangerous." *Id.* Similar to a broken locker in an area with ongoing horseplay, the dangerous condition of bullying—and, in particular, Doe's continuing status as a target of repeated assaults—"was so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to prevent the harm." *Id. See also Palmieri v. Town of Southington Bd. of Educ.,* 2015 WL 4726934 (Conn. Super. 2015) (unreported) (denying summary judgment on the question of identifiable victim, imminent harm where the plaintiff had reported harassment and threats from a student to school officials, and was then attacked by that student).

Drawing all reasonable inferences in Doe's favor, I find that the allegations state a claim under the identifiable victim, imminent harm exception to municipal immunity.

### C. Intentional Infliction of Emotional Distress (Count Four)

Finally, defendants argue that Doe has failed to allege sufficiently an intentional infliction of emotional distress claim, because the defendants had no intent to cause emotional distress and the alleged conduct was not extreme and outrageous. To state a claim for intentional infliction of emotional distress, the plaintiff must allege "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ.*, 254 Conn. 205, 210 (2000). The defendant's conduct must be "beyond all possible bounds of decency,… be atrocious, and utterly intolerable." *Id.* at 210–11. Merely

insulting or rude actions are insufficient to plead a claim for intentional infliction of emotional distress. *Id.* at 211.

For the individual defendants besides Dunaj, their conduct plainly did not rise to the level of "extreme and outrageous." In the context of the due process claim, the Court held that these defendants did not exhibit behavior "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" (ECF No. 75 at 15-16, *quoting Matican v. City of N.Y.*, 524 F.3d 151, 155 (2d Cir. 2008).) The Court noted that "Doe's allegations suggest that, at times, school employees did not take seriously enough his and his mother's complaints about bullying, and at times downplayed reports of harassment," but held that those allegations did not rise to the level of "egregious" or "outrageous" conduct. (*Id.* at 16-17.) Just as in the due process context, the alleged conduct of these individual defendants does not constitute "extreme and outrageous" behavior sufficient to state an intentional infliction of emotional distress claim. While Doe alleges that he *experienced* physical and sexual assault by other students that could easily be characterized as "beyond all possible bounds of decency," defendants did not themselves commit those assaults.

As for Dunaj, Doe has made a plausible claim of intentional infliction of emotional distress. Dunaj argues that the alleged conduct was not sufficiently extreme and outrageous, stating that "the most that the plaintiff has alleged is that the defendants were unaware of certain students' misconduct and failed to take action to prevent it." (ECF No. 95-1 at 19.) However, as discussed in the Court's ruling on the motion for reconsideration (ECF No. 90), Doe alleges that Dunaj encouraged and condoned student athletes' violent behavior—conduct, which, if true, would go beyond a mere failure to act. For example, Dunaj allegedly called Doe a "pussy," "bitch," and "baby." (ECF No. 91 ¶ 45.) Dunaj also told the football team about Doe's in-school suspension and punished the entire team by forcing them to run sprinting exercises—a punishment he

allegedly knew would result in other players physically retaliating against Doe. (*Id.* ¶¶ 53-56.) And one coach, who may have been Dunaj but was at least under Dunaj's supervision, responded to an assault where students held a younger student down and put Icy-Hot on his genitals, by saying, "just don't mount each other." (*Id.* ¶ 79.)

Also, as a football coach and school employee, Dunaj was in a position of power over Doe, and Doe alleges that he abused that power. *See Craig v. Yale Univ. Sch. of Med.*, 838 F. Supp. 2d 4, 11, n.7 (D. Conn. 2011) ("police officers, school authorities, landlords, and collecting creditors have been held liable for extreme abuse of their positions."); *Sangan v. Yale Univ.*, 2006 WL 2682240, at \*6 (D. Conn. 2006) ("[B]ehavior which otherwise fails to constitute extreme and outrageous conduct may yet rise to that intolerable level, and thus be actionable as IIED, when it arises from an abuse by the actor of a position, or a relation with another, which gives him actual or apparent authority over the other or power to affect his interests.") (citation, quotation marks, and alteration omitted). Bearing in mind that the Court must draw all reasonable inferences in favor of the plaintiff, the Court finds that a high school football coach encouraging hazing of students of the severity alleged here is not merely insulting or impolite, but, at least as construed at the pleading stage, beyond all possible bounds of decency, i.e., the sort of conduct that could lead "an average member of the community… to exclaim, 'Outrageous!'" *Appleton*, 254 Conn. at 211.

## V.     CONCLUSION

For the foregoing reasons, Dunaj and McKenna's amended motion to dismiss (ECF No. 95) is GRANTED in part and DENIED in part. Their initial motion to dismiss (ECF No. 94) is DENIED as moot. The remaining defendants' motion to dismiss (ECF No. 96) is GRANTED in part and DENIED in part. Doe's claims of intentional infliction of emotional distress against Gerard Carbone, Joanne Creedon, Johanna DeZurik, James Dziekan, Cheryl Kloczko, Michael

McKenna, and Charles McSpiritt are dismissed. The case may proceed as to the substantive due process claim under a theory of state created danger against Dunaj (Count One), the negligence claims against all defendants (Counts Two, Three, and Five), and the intentional infliction of emotional distress claim against Dunaj (Count Four).

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                August 7, 2017